Timothy P. Miller (CBN 108480)
TIMOTHY PAUL MILLER
A Professional Law Corporation
5225 Canyon Crest Dr., #71-143
Riverside, CA 92507
Tel.: 951-897-6679

Attorney for Plaintiffs, Silver Rios and Cheryl Sanders

UNITED STATES BANKRUPCTY COURT

CENTRAL DISTRICT OF CALIFORNIA-RIVERSIDE DIVISION

| | |
|---|---|
| IN RE:<br><br>Cheryl Sanders<br><br>_____<br><br>SILVER RIOS, an individual and CHERYL SANDERS, an individual,<br><br>          Plaintiffs<br><br>v.<br><br>OCWEN FINANCIAL CORPORATION, a Florida corporation, OCWEN MORTGAGE SERVICING, INC., a U.S. Virgin Islands corporation, and OCWEN LOAN SERVICING, LLC, a Delaware limited liability company,<br><br>          Defendants | CASE NO.: 6:15-bk-22224-SY<br><br>CHAPTER 13<br><br>ADVERSARY NO:<br><br>COMPLAINT FOR:<br><br>1. Violations of the California Deceptive and Unfair Trade Practices Act;<br><br>2. Violations of the California Deceptive and Unfair Trade Practices Act for Failure to Timely and Appropriately Credit Payments;<br><br>3. Violations of RESPA Regarding Escrow Violations;<br><br>4. Violations of RESPA Regarding Qualified Written Request;<br><br>5. Violations of the Automatic Stay; and<br><br>6. Accounting |

For its Complaint for (1) Violations of the California Deceptive and Unfair Trade Practices Act, (2) Violations of the California Deceptive and Unfair Trade Practices Act for Failure to Timely and Appropriately Credit Payments, (3) Violations of RESPA Regarding Escrow Violations, (4) Violations of RESPA Regarding Qualified Written Request, (5) Violations of the Automatic Stay, and (6) Accounting ("Complaint"), Plaintiffs, Silver Rios and Cheryl Sanders ("Plaintiffs") hereby allege and aver as follows:

## STATEMENT OF JURISDICTION AND PROCEEDINGS

1. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a), as this is a core proceeding under 28 U.S.C. § 157(b)(2)(A). Venue properly lies in this judicial district pursuant to 28 U.S.C. § 1409(a) because this is a civil proceeding arising in and/or related to the Debtors' pending Chapter 13 case, United States Bankruptcy Court for the Central District of California [In re Cheryl Sanders, Bankruptcy No. 6:15-bk-22224-SY, (the "Bankruptcy Case")].

2. This Court has subject matter jurisdiction over this action because it presents a federal question, 28 U.S.C. § 1331 and is "brought under Federal consumer financial law," 12 U.S.C. § 5565(a), 12 U.S.C. § 2605.

3. In addition, this Court has supplemental jurisdiction over the subject matter of the state law claims asserted by Plaintiffs because those claims are so related to the claims brought under Federal consumer financial law that they form part of the same case or controversy, and because those claims arise out of the same transactions or occurrences as the claims brought by Plaintiffs.

4. Venue is proper in this district because the Ocwen Defendants are located in or do business in this district and a substantial part of the events or omissions and course of conduct giving rise to the claims set forth in this Complaint occurred in this district.

///

///

///

**PARTIES**

5.      Plaintiffs, Silver Rios and Cheryl Sanders are individuals with real property located at 2884 Mellor Street, Corona, California encumbered by a mortgage loan serviced by Ocwen Loan Servicing, LLC.

6.      Ocwen Mortgage Servicing, Inc. ("OMS") is a United States Virgin Island corporation that maintains its principal place of business in the United States Virgin Islands. At all times relevant to this complaint, OMS has done business in this District and throughout the United States.

7.      Ocwen Loan Servicing, LLC ("OLS") is a Delaware limited liability company that maintains its principal place of business in West Palm Beach, Florida. At all times relevant to this complaint, OLS has done business in this District and throughout the United States.

8.      OFC, the parent and publicly-traded company, wholly owns all of the common stock of its primary operating subsidiary, OMS. OMS wholly owns the stock of another of OFC's primary operating subsidiaries, OLS. All three entities share and have shared key executives, such as Ronald Faris, Timothy Hayes, Michael Bourque, and John Patrick Cox. All three entities, through OFC, file a consolidated financial statement with OFC's public disclosures.

9.      OFC, through its subsidiaries, originates and services loans. OFC, OMS, and OLS (collectively "Ocwen") engage in servicing activities relating to the loans by, among other things, processing borrower payments, administering loss mitigation processes, and managing foreclosures. Ocwen also acquires and collects upon borrowers' mortgage debts that are in default.

10.      OFC controls, directs, operates, and participates in mortgage servicing activities, including the daily cashiering, escrow, insurance, loss mitigation, foreclosure, call center, and consumer complaint operations for Ocwen's loans. OFC enters into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. OFC has contracted for such products and services, including a system of record and related technology services, for and on behalf of Ocwen's affiliates, which include OMS and OLS.

3
_____

11.     OMS is also engaged in servicing loans. OMS is licensed by numerous state regulators to service loans and collect mortgage debts. OMS has entered into agreements for products and services that are necessary for Ocwen to service mortgage loans and collect debt. OMS has contracted for such products and services, including a system of record and related technology services used by OLS and OFC. OLS also represented, in an August 23, 2016 Consent Order with the State of Washington Department of Financial Institutions, that OMS engages in the servicing or subservicing of OLS loans.

12.     OLS is also engaged in servicing loans. OLS is licensed by numerous state regulators to service loans and collect upon borrowers' mortgage debts. OLS is also the owner of the mortgage servicing rights for the loans that Ocwen services.

13.     Under OFC's and OMS's direction, authority, and control, OLS has also engaged in the marketing and processing and transmitting of payments for credit monitoring products, financial advisory products, and other products that are added on to Ocwen borrowers' accounts.

14. OFC and OMS have directed and controlled OLS's mortgage servicing activities and marketing of and payment processing and transmitting payments for add-on products, and authorized OLS to service Ocwen's loans. Employees of OFC and OMS have knowledge of and control or have the ability to control the activities of OLS. OFC and OMS, as OLS's principals, are liable for the actions of their agent, OLS.

## FACTUAL ALLEGATIONS

**I.    BACKGROUND**

**A.     The Company.**

15.     Ocwen services and subservices home mortgage loans secured by residential properties owned by individual citizens of the State of California and of the United States and is currently the second largest non-bank mortgage servicer in the United States.

16.     Borrowers do not choose their mortgage servicer and have no control over whether and how Ocwen services their loans.

///

_____
Adversary Complaint

17.    In addition to collecting payments and disbursing escrows, Ocwen regularly reviews mortgage loans for potential loss mitigation or loss mitigation options, including loan modifications, and manages the foreclosure process.

18.    While OLS is the flagship mortgage loan servicer within the Ocwen family, as set forth above, each of the Ocwen Defendants perform mortgage servicing and/or debt collection activities. Additional Ocwen affiliates who perform mortgage servicing and/or debt collection on behalf of Ocwen include the following:

a. Ocwen Financial Solutions Private Limited ("OFSPL"): OFSPL is an India entity that is licensed to conduct mortgage loan servicing and debt collection agency activities in a significant number of jurisdictions; and

b. Homeward Residential Corporation India Private Limited ("HRCIPL"): HRCIPL is an India entity that is licensed to conduct debt collection agency activities in several jurisdictions.

19.    Ocwen relies on Altisource Portfolio Solutions ("Altisource"), an affiliated vendor, to provide technology services and perform other servicing functions.

20.    In 2009, Ocwen Financial spun off its internal technology department into Altisource. As a result of this spin-off, Altisource owns and maintains the REALServicing platform, and Ocwen has contracted with Altisource for technology services. Altisource derives a majority of its revenue from the services it provides to Ocwen.

**B.    Ocwen's REALServicing System of Record.**

21.    Fundamental functions of a mortgage servicer include processing and applying borrower payments, communicating accurate payment information to borrowers, managing escrow accounts, and maintaining accurate loan balance information.

22.    Servicers use systems of record to service loans and automate servicing functions.

///

///

///

23.     To perform these tasks, servicers input loan and borrower information into electronic databases, often referred to as systems of record. Systems of record are essential to a servicer's ability to service loans in accordance with applicable legal requirements. If the information the servicer inputs into the system of record is inaccurate, or the system itself has deficiencies that produce inaccurate information even when the servicer inputs correct information, a servicer can make critical errors that harm borrowers.

24.     Ocwen has used and continues to use a proprietary system of record, REALServicing, and its related sub-systems (collectively "REALServicing").

25.     In 2009, Ocwen spun off its internal technology department into a separate company, Altisource Portfolio Solutions ("Altisource"). As a result of this spin off, Altisource owns and maintains the REALServicing platform. Ocwen has contracted with Altisource for technology services. In 2012 and 2013, while Erbey was the Chairman of the Boards of both Altisource and Ocwen, Ocwen extended this technology services contract through 2025.

26.     No other mortgage servicer uses REALServicing.

## II.     OCWEN HAS SERVICED PLAINTIFFS LOAN BASED ON INACCURATE AND INCOMPLETE INFORMATION

27.     As set forth in greater detail below, Ocwen has serviced Plaintiffs loan and collected upon the debt based on inaccurate and incomplete borrower loan information. Ocwen has often input inaccurate and incomplete information, or failed to input accurate or complete information, about Plaintiffs loan into its REALServicing system of record. Even when the information in REALServicing has been accurate, REALServicing has generated inaccurate information about Plaintiffs loan due to system deficiencies. Because of these system deficiencies, Ocwen has had to rely upon manual processes and workarounds that have themselves resulted in errors in Plaintiffs loan information.

28.     Ocwen's use of inaccurate and incomplete information to collect mortgage, tax, and insurance payments, communicate with Plaintiffs, loan balance, etc. has resulted in significant harm to Plaintiffs.

*///*

_____
Adversary Complaint

**A.      Ocwen's reliance on its deficient servicing platform, REALServicing, has exacerbated its use of inaccurate loan information.**

     *1.      Ocwen and its outside consultant have concluded that REALServicing is failing.*

29.      Ocwen's own senior leadership has repeatedly recognized and acknowledged REALServicing's failures.

30.      For example, in an internal communication in 2014 with Ocwen's Chief Executive Officer, Ocwen's Head of Servicing described Ocwen's technology as:

> **An absolute train wreck. I know there's no shot in hell, but if I could change systems tomorrow I would.** I can't tell you the number of hours I and others spend on basic servicing technology blocking and tackling. I'm not talking about differentiators here. I'm talking about getting system to stay online, escrow analysis to work, letters to print, etc. It's ridiculous. (Emphasis added.)

31.      Ocwen's former Head of Servicing Compliance testified in May 2016 that she was "absolutely" concerned that Ocwen could not service loans on REALServicing in compliance with applicable laws when she worked at the company between 2014 and 2015. She testified that she, other members of the Compliance Department, and the leaders of Servicing Operations, Loss Mitigation, and other Ocwen business units "frequently" and "loudly" raised this concern. In determining the root cause of various issues, she explained, "the answer would almost always be REALServicing and the processes that we're using, would be the answer we would get from the business . . . . [It was a] commonality across all of [the business units] . . . . Everything in servicing, every department in servicing."

32.      These senior leaders' conclusions are not outliers. Between 2014 and 2016, Ocwen assessed REALServicing and also hired an outside consultant to do the same.  Both Ocwen and its consultant concluded that REALServicing lacks the basic system architecture and design necessary to properly service loans.

///

///

///

_____

33. Since 2014, Ocwen has also tracked its regulatory violations, risk areas, and other failures in spreadsheets named "Risk Convergence Reports." Each regulatory violation, risk item, or failure identified in the report includes a description of the issue, the date Ocwen identified the issue, whether the issue is dependent on Altisource, the status of any technology fix or other operational remediation, and other information.

34. Each item in the Risk Convergence Reports is assigned a risk rating, ranging from "R1" to "R5." "R1" is the highest risk rating, which Ocwen defines as: "Potential adverse impact of over $5 million"; "Actual or high possibility for fraud, waste or abuse"; "Breach of company policy or procedures (frequent, repeat, or disregarding policy)"; "Noncompliance with the law or regulation"; or "Material errors or irregularities are a reasonable possibility."

35. According to Ocwen's list of items in the Risk Convergence Report, the items often resulted from and have continued due to REALServicing failures or system limitations. When, for example, Ocwen conducted its first on-site audit of Altisource and REALServicing in 2014, Ocwen auditors concluded that, although 70 percent of the items contained within the Risk Convergence Report related to "technology projects and enhancements" that Altisource was responsible for, little progress was being made to resolve the items due to Altisource's "lack of priority."

36. As of August 2015, Ocwen had catalogued 2,803 issues on its Risk Convergence Report. Of those 2,803 issues, Ocwen assigned the highest risk rating, "R1," to more than 550 issues, many of which resulted from REALServicing's deficiencies.

37. In 2016, Ocwen's Chief Information Officer and other personnel performed an architectural assessment of REALServicing, and reported, among other things, that REALServicing had "significant deficiencies represent[ing] significant risk and expense to Ocwen" and concluded that the "the most important dimensions of Core Technology" to REALServicing, such as performance and scalability, loan type support, risk exposure, and organizational capability, compare "unfavorably" to other mortgage platforms.

///

///

_____
Adversary Complaint

2. *REALServicing's deficiencies impact Ocwen's ability to lawfully service Plaintiffs loan.*

38.  REALServicing suffers from fundamental system architecture and design flaws, including a lack of properly managed data, lack of automation, and lack of capacity. These flaws have adversely impacted the accuracy of the information that Ocwen uses to service loans–and, thus, Ocwen's ability to service loans–in a number of ways.

39.  First, with respect to Ocwen's data management, REALServicing requires the use of more than 10,000 comment codes and flags. Yet, Ocwen lacks a complete data dictionary defining its comment codes, flags, and data fields. As a result, Ocwen personnel do not share a common understanding of what these comment codes or flags mean or how Ocwen personnel should use them.

40.  Ocwen employees also do not understand how changes to certain codes impact other codes or work processes. Ocwen's former Head of Compliance, who worked at Ocwen from August of 2013 until September of 2015, testified in May 2016 that during his tenure at Ocwen he repeatedly requested information on the meaning and basic descriptive information of comment codes; how Ocwen's business units used them; and what downstream activities the codes trigger and what upstream activities trigger the codes. He further testified that "neither Ocwen nor Altisource could provide that information." Further, he testified that Ocwen's use of thousands of REALServicing comment codes was "antiquated" and that it was "inappropriate" that Ocwen did not have a data dictionary to define these codes and describe their impact on other activities.

41.  Second, REALServicing lacks the necessary automation and functionality to handle basic servicing operations. In 2015, an Ocwen consultant concluded that REALServicing had limited workflows and lacked automation.  In certain areas, such as payment processing and escrow, this lack of automation has resulted in significant and excessive manual workarounds that have created errors in borrowers' accounts.

///

///

_____
Adversary Complaint

42.  Third, REALServicing has lacked the capacity to process the large number of loans that Ocwen has acquired and, in part as a result, it has not been functional for lengthy periods of time. After Ocwen's large 2013 and 2014 loan acquisitions, Ocwen's personnel reported "high incidents of system unavailability." For example, for the year of 2014, Ocwen's officials reported that its loss mitigation system "was down approximately 17,000 work hours." In internal communications in 2014, Ocwen's Head of Loss Mitigation expressed exasperation about the unavailability of Ocwen's loan modification systems:

> I am sorry guys, this has broken my back. Enough is enough on daily issues with these systems. We have lost more than 15 days of production of past 3 months … I need this system up every day and performing. It is clear by the issues over the past 3 months that there are not any controls on data and system quality. (Emphases added.)

43.  Fourth, REALServicing suffers from various bugs, defects, and failures. For example, in 2014, due to programming errors and data not properly converting among REALServicing applications, Ocwen sent more than 1,800 borrowers permanent loan modification agreements that contained incorrect interest rate, principal payment, maturity date, and balloon payment information.

**B.    Ocwen has relied excessively on manual data entry and reports to address REALServicing's failures.**

44.  Because of REALServicing's failures and limitations, Ocwen has resorted to manual processes, which themselves have resulted in errors. Ocwen's consultant reached the following conclusions—which Ocwen conceded were correct—after analyzing REALServicing and interviewing Ocwen business leaders:

- "[Ocwen's] lack of business process automation has resulted in excessive manual processes to address gaps";

- "Manual workarounds and reporting are widely used to compensate for insufficient system functionality to complete, track, or control processes"; and

- While appearing cost effective, manual controls pose significant risk in heightened compliance environment." (Emphases in original.)

45.     Ocwen creates reports–typically referred to as "control reports"–to catch errors and mistakes or data that REALServicing cannot process due to a lack of automation and other system deficiencies, but these reports are of limited use for at least two reasons.

46.     First, as Ocwen's former Head of Compliance testified, the reports are only effective to the extent that they are based on accurate and complete data. But Ocwen's former Head of Servicing Compliance, who worked for Ocwen from April of 2014 until August 2015, testified in May 2016 that REALServicing lacks the necessary data to generate effective control reports and detect problems. She explained, for example, that when generating a control report using a certain field in REALServicing, that field is "used about five different ways" so the report generates a "whole mish-mash of information" that does not help Ocwen personnel understand whether an exception or error occurred.

47.     Second, Ocwen's manual workarounds and processes introduce the risk of human error. As Ocwen's former Head of Compliance testified, the concern that such manual processes could result in human error is "one of the sort of classic reasons one automates a manual process." Other former and current Ocwen business unit leaders have reiterated this point.

48.     For these reasons, Ocwen's controls have been ineffective. As Ocwen's former Head of Servicing Compliance testified: "[E]very business unit in the entire organization" lacked sufficient controls to prevent mistakes and to detect when mistakes occurred.

///

///

///

_____
Adversary Complaint

**C.      Ocwen's use of inaccurate and incomplete information has harmed Plaintiffs.**

49.     Ocwen's use of inaccurate and incomplete information resulting from its boarding of inaccurate and incomplete information into REALServicing, REALServicing's deficiencies, and Ocwen's error-prone manual processes has caused Plaintiffs substantial harm, and resulted in Ocwen communicating, orally and in writing, information to Plaintiffs that it knew or had a reason to know was inaccurate, including information contained in a Motion to Lift the Automatic Stay filed by Ocwen in Sanders' bankruptcy action.

50.     Ocwen is aware of this substantial harm or likelihood of substantial harm. In 2015, Ocwen's outside consultant conducted interviews with Ocwen business leaders. These leaders identified 67 failures—or "pain points"—representing "functional and/or technical deficiencies" that "stemm[ed] from systematic and manual processes," including the following:

- With respect to escrow: a "technical gap causing escrow analysis to be conducted incorrectly" and a "manual bankruptcy workaround for loans acquired already in bankruptcy, causes information to be deleted from history as new information is updated. This information should be disclosed to the borrower in order to calculated escrow accurately";

- With respect to insurance disbursements: "no systematic controls exist in to prevent duplicate disbursements in REALServicing resulting in 6k -12k incidents per year. Personnel must manually remove necessary codes (e.g., paid in full, service released)";

- With respect to loan modification processes: "[u]pon review of a [loan modification] package, terms are found to be incorrect approximately 80% of the time (e.g., NPV miscalculation, final modification date incorrect)";

- With respect to foreclosure data: "[d]ata between REALResolution [the REALServicing application for foreclosures] and REALServicing is not always in sync due to lack of adequate system mapping"; and

- With respect to the payment of borrower taxes: "[a]lthough tax assessment information is supposed to be used to project more accurate payments, REALServicing automatically uses last years billing amount, even if installments for the current year are different."

51.    More generally, Ocwen has serviced Plaintiffs loan and communicated, orally and in writing, with Plaintiffs using inaccurate and incomplete information, including information relating to Plaintiffs loan terms, amounts received from and owed by Plaintiffs, escrow amounts, insurance amounts, and/or loss mitigation and foreclosure information. Because Ocwen has serviced Plaintiffs loan based on inaccurate and incomplete information, it has, among other things, collected or attempted to collect inaccurate amounts from Plaintiffs, failed to timely pay Plaintiffs insurance policies, provided Plaintiffs with a loan modification with inaccurate terms, and presented to this Court in its Motion for Relief from the Automatic Stay incorrect information.

52.    Ocwen's use of a deficient system of record that results in inaccurate and incomplete borrower loan information does not benefit consumers or competition. Such a system of record does not result in cost savings, enhanced customer service, or other benefit to consumers or competition.

## III.    OCWEN'S SERVICING FAILURES HAVE MANIFESTED THEMSELVES IN AT LEAST EIGHT DISTINCT WAYS THAT HARM PLAINTIFFS

### A.    Ocwen has mishandled Plaintiffs payments.

53.    Ocwen is required to correctly credit borrowers' payments, including any overpayment or partial payments, consistent with the Plaintiffs mortgage notes and applicable laws, including Regulation Z.

54.    Ocwen has routinely failed to send Plaintiffs timely and accurate periodic statements, failed to timely and accurately credit and apply Plaintiffs payments, and failed to correct billing and payment errors.

///

///

_____
Adversary Complaint

55.     Each day, Ocwen cashiering personnel manually enter, pull, and match entries in REALServicing for more than 45,000 borrower-related transactions, including 5,000 payment transactions and more than 40,000 disbursements. Ocwen internal business units requested that Ocwen automate REALServicing to process borrowers' payments and disbursements for taxes and insurance. They explained that, "due to the volume[,]" there is an "immense need to automate this reconciliation" to ensure "no risk for data loss or corruption."

56.     As Ocwen's former Head of Compliance testified, Ocwen has a higher risk profile in the mortgage servicing industry due its heavy use of manual processes in its Cashiering Unit, which handles credits to (e.g., borrowers' payments) and debits from (e.g., disbursements for taxes or insurances) a borrower's loan balance.

        *1.*     *Ocwen's obligations under Regulation Z, Regulation X and the FDCPA.*

57.     Under Regulation Z, a servicer generally must provide a borrower with a periodic statement each month that details, among other things, the amount the borrower must pay that month, how the servicer will break down and apply the borrower's monthly payment, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account. When a servicer receives a full periodic payment for a loan secured by the consumer's principal residence, it must credit the payment as of the date the payment is received unless, among other exceptions, the delay in crediting does not result in a charge to the borrower or negative reporting to a consumer reporting agency.

58.     If the servicer receives a partial payment and holds it in a suspense or unapplied funds account, Ocwen must, after accumulating funds sufficient to cover a periodic payment, treat such funds as a full periodic payment (e.g., an amount sufficient to cover principal, interest, and escrow, if applicable, for any given billing cycle).

59.     Under Regulation X, a servicer is also required to have policies and procedures reasonably designed to ensure, among other objectives, that the servicer is providing accurate and timely disclosures to a borrower as required by applicable law, such as periodic statements required under Regulation Z.

///

60.     In addition to the requirements under Regulation Z and Regulation X, a servicer is prohibited from engaging in unfair, deceptive, and abusive acts and practices related to payment crediting and debt collection activities under the FDCPA.

>    *2.     Ocwen has failed to comply with Regulation Z, Regulation X, and the FDCPA.*

61.     Ocwen has failed to comply with Regulation Z, Regulation X, and/or the FDCPA in at least six ways.

62.     First, in numerous instances, Ocwen has sent Plaintiffs periodic statements that contain inaccurate information—such as the date when Ocwen received Plaintiffs payment or the payment amount owed by Plaintiffs—because of inaccurate information in REALServicing. In other instances, even when the information in REALServicing has been accurate, REALServicing's deficiencies have resulted in Ocwen sending Plaintiffs periodic statements with inaccurate information related to interest, late fees, escrow amounts, payment amounts, deferred principal balance amounts, and payments that Ocwen should have credited, credited but then reversed. As demonstrated by Ocwen's recurring inaccuracies in its periodic statements, Ocwen has also failed to maintain reasonably designed policies and procedures to ensure that it is providing Plaintiffs with accurate and timely periodic statements.

63.     Second, Ocwen has failed to properly credit full periodic payments that Plaintiffs properly made to Ocwen as of the date of receipt, wrongly resulting in late fees, negative credit reporting, and inaccurate loan delinquencies.

64.     Since at least 2014, Ocwen has known that its lockbox vendor, which handled its intake of physical payments (e.g., checks) until 2016, was unable to accurately record the date when Ocwen received a borrower's physical payment. As Ocwen detailed in its Risk Convergence Reports, this failure has resulted in "delayed payment posting, incorrect payment effective dating, late fees assessment, and negative credit reporting."

///
///
///

65.    Ocwen has identified numerous other payment processing errors by its personnel and lockbox vendor, including:

- Inconsistent processing of multiple payments (2 or more checks in one envelope) that "cause misapplication of physical payments by applying as an individual payment instead of combined multi-payment";

- Ocwen's lockbox vendor's failure to image correspondence received with payments, resulting in payments not being correctly identified "until a borrower claim is received. Ultimately, this results in delays in payment posting process, late fee assessment, and negative credit reporting;" and

- Where borrower payments by wire are manually entered and converted by Ocwen personnel into REALServicing: "[s]ometimes the file conversion does not convert the data properly and the data needs to be reviewed, corrected and uploaded to REALServicing by Cashiering" and "[e]rrors can occur during this manual process."

66.    Even after switching lockbox vendors in 2016, Ocwen continued to identify payment processing mistakes. For example, in January of 2016, Ocwen found that "$8,420,208 in payments were received but not posted to customer's accounts." Ocwen concluded: "Management has identified that not applying received payments or loading payments multiple times has become a common occurrence."

67.    Third, Ocwen has failed to timely credit payments from borrowers' suspense accounts when the suspense amount has accumulated sufficient funds to cover a full periodic payment. Ocwen has allowed borrowers' payments to languish in suspense accounts for several days, months, and even years. As a result of Ocwen's failure to timely credit payments in suspense accounts, Ocwen has charged Plaintiffs late fees and deemed Plaintiffs to be delinquent.

///

///

///

_____
Adversary Complaint

68.    For example, a September 15, 2015 audit by investors of loans Ocwen serviced found that: "unapplied/suspense funds were not properly maintained," and that, as of June 2015, more than 4,000 of the investor's loans had suspense amounts "aged over 90 days up to 1,236 days" that totaled more than $2.6 million with amounts ranging to $0.01 to more than $27,000. The auditors also found that for the miscellaneous suspense account there were more than 2,000 investor loans "with amounts over 90 days and up to 680 days and that totaled over $1.9 million with amounts [in the suspense account] ranging from $0.01 to $267,475.64."

69.    Fourth, Ocwen has misapplied Plaintiffs payments and miscalculated Plaintiffs loan balance and amounts due. Once Ocwen receives a payment from a borrower, the mortgage contract specifies how Ocwen must credit the payment (e.g., to principal and interest first, then to any late and default fees). Ocwen has identified numerous instances where it has misapplied borrowers' payments and miscalculated borrowers' loan balances and amounts due. For example, in May 2016 Ocwen determined that, due to a failed attempt in 2014 to fix a REALServicing technology flaw, it was charging incorrect amounts to borrowers and was "not being compliant with the terms dictated in the note" which "directly impact the monthly account statement sent to the borrowers."

70.    Fifth, for borrowers in bankruptcy, such as Plaintiff Sanders, Ocwen has failed to process and apply payments correctly in accordance with certain bankruptcy requirements. By 2016, Ocwen had concluded that REALServicing was broken in a number of ways that adversely affected borrowers whose loans were subject to bankruptcy protections, including that:

- "When REALServicing makes a contractual payment using pre- or post-petition funds, the payment covers only the principal and interest component. Escrow is not paid. This is contrary to what a bankruptcy court expects. Payments should only be made for the full contractual amount, including the escrow (as calculated for the due date of the payment to be made);"

///

///

- "There is no connection between the proof of claim as determined in Equator/REALResolution [the system Ocwen uses to process bankruptcy] and the pre-petition arrearage balances in REALServicing. The proof of claim figures need to become the REALServicing arrearage balances."

- "The process of converting a bankruptcy trustee payment to a payment batch is highly manual and, therefore, both inefficient and at risk of error. Ocwen receives funds from bankruptcy trustees that, generally, need to be applied to borrower accounts as either pre-petition payments, post-petition payments, or bankruptcy interests. There are some cases where, due to loan status, funds from the trustee are not applied as payment, but are applied to miscellaneous suspense or other non-payment accounts. Ocwen receives funds from bankruptcy trustees in a single check that usually covers multiple accounts. Ocwen needs to apply the funds across the different loans."

- Sixth, based on Ocwen's above failures, Ocwen has communicated, orally and in writing, inaccurate information to Plaintiffs about amounts due from Plaintiffs, amounts received from Plaintiffs, dates as to when Ocwen received Plaintiffs payments, and Plaintiffs delinquency status. These representations are material to Plaintiffs managing their mortgage and have mislead Plaintiffs acting reasonably under the circumstances.

> 3.    *Ocwen's payment processing failures have caused significant harm to the Plaintiffs.*

71.    Ocwen's errors in crediting Plaintiffs payments and use of inaccurate payment information have significantly harmed Plaintiffs. Ocwen has charged Plaintiffs improper late fees; reported inaccurate, negative payment information to credit reporting agencies; subjected Plaintiffs to collection calls based on inaccurate information; and wrongly threatened Plaintiffs with foreclosure. This conduct has harmed Plaintiffs financially and caused Plaintiffs frustration and emotional distress.

72.    Even when Ocwen has identified a payment error, in many instances it has not properly corrected the error. Pursuant to Ocwen's policies and procedures, its Cashiering Department corrects identified errors through a "reversal request" or correction to a borrower's

account. In many instances, however, Ocwen's personnel have not made the reversal request in a timely or accurate manner.

73.    A March 30, 2016 internal audit found, for example, that Ocwen's Cashiering Department lacked controls to ensure that reversal requests–approximately 3,700 a month at that time—were timely and accurately processed. The auditors also found that, when Ocwen actually processed reversal requests, it processed requests in the sample incorrectly.

74.    Not surprisingly, given Ocwen's significant problems crediting and applying borrower payments, a large number of borrowers, including Plaintiffs, have complained about Ocwen's payment processing.

75.    From April 2015 to April 2016 alone, Ocwen received complaints from more than 68,000 borrowers related to its processing of payments. Ocwen determined it made numerous errors in the following categories: "Payments Not Applied Correctly"; "Funds Not Applied Correctly"; "Reversal Requests"; "Late and NSF Fees"; "Payment Missing –Not Applied to Account"; "Chargeback Issue - Borrower Disputes Charged Back Item"; "Fee Assessed Improperly"; "Payment Not Processed Timely"; "ACH Drafted Incorrectly (Incorrect Date, Multiple Drafts, etc.)"; "Payoff Overage"; "ACH Payment – Chargeback"; and "Incorrect Data in the Account Statement."

**B.    Ocwen has botched Plaintiffs escrow account.**

76.    Ocwen has also failed to perform basic tasks associated with managing Plaintiffs escrow account. Specifically, due to systems failures, control lapses, and excessive reliance on manual processes, Ocwen has failed to conduct escrow analyses or accurate escrow analyses; failed to timely send Plaintiffs accurate escrow statements; and failed to properly account for and apply Plaintiffs escrow shortage payments.

///

///

///

77.    As of April 2016, Ocwen managed escrow accounts for more than 78 percent of the loans it services. In 2014, Ocwen hired consultants to review and report upon its escrow practices. The resulting report identified more than three million "documented CFPB violations" during 2014, including Ocwen's failure to: provide escrow statements or accurate escrow statements to borrowers; conduct escrow analyses or accurate escrow analyses; and accurately impose hazard and flood insurance.

   1.    *Ocwen's obligations under RESPA, the CFPA, and the FDCPA.*

78.    RESPA and Regulation X generally require servicers to do the following for escrow accounts that they establish in connection with a federally related mortgage loan: (1) perform an annual escrow analysis to determine the monthly escrow account payments for the next computation year; (2) provide an annual statement reflecting the activity in the escrow account during the escrow account computation year and a projection of the activity in the account for the next year; (3) refund to the borrower any surplus disclosed in an escrow analysis or, if the surplus is less than $50, alternatively credit such surplus against future escrow payments; and (4) potentially seek repayment for any shortage (i.e., the amount by which a current escrow account balance falls short of the target balance at the time of an escrow analysis) disclosed in an escrow analysis.

79.    Under Regulation X, a servicer is also required to have policies and procedures reasonably designed to ensure, among other objectives, that the servicer is providing accurate and timely disclosures to a borrower as required by applicable law, such as escrow statements required under Regulation X.

80.    In addition, the CFPA and FDCPA prohibit servicers from engaging in unfair, deceptive, and abusive acts and practices related to escrow and debt collection activities.

   2.    *Ocwen has failed to comply with RESPA, the CFPA, and the FDCPA.*

81.    Ocwen has failed to comply with RESPA and/or the FDCPA in at least five ways.

82.    First, as of mid-2014, Ocwen had failed to conduct annual escrow analyses within the required time period for Plaintiffs, in violation of Regulation X.

83.     According to the Head of Ocwen's Escrow Department, until at least July or August of 2014, Ocwen did not conduct these annual analyses for borrowers in delinquency.

84.     Ocwen's failure to conduct escrow analyses for Plaintiffs impacted the accuracy of Plaintiffs payoff and reinstatement quotes. Because REALServicing's calculation of Plaintiffs payoff and reinstatement quotes— the amount they need to pay to respectively payoff or reinstate their loan to become current—depends in part on Plaintiffs escrow balance, REALServicing miscalculated the payoff and reinstatement quotes for Plaintiffs loan for which Ocwen did not conduct an escrow analysis. Ocwen's failure to conduct escrow analyses resulted in Ocwen providing Plaintiffs with inaccurate reinstatement quotes.

85.     Ocwen failed to perform or timely perform escrow analyses during the pendency of Plaintiffs Sanders' Chapter 13 bankruptcy. Further, Ocwen failed to service its loans in accordance with bankruptcy protections and has attempted to collect purported escrow shortages or arrears in violation of bankruptcy orders and rules.

86.     In June 2016, Ocwen's Head of Bankruptcy testified that more than 22,000 borrowers in bankruptcy were impacted by Ocwen's failure to conduct a timely escrow analysis and that Ocwen is currently attempting to remediate these borrowers. Ocwen's consumer complaint data indicates that, for the year of April 2015 to April 2016, at least 8,000 of these 22,000 impacted borrowers complained to Ocwen.

87.     In many instances, even when Ocwen has performed escrow analyses on borrowers' accounts, Ocwen has either: (1) failed to send escrow statements to borrowers because of REALServicing system deficiencies; or (2) sent inaccurate escrow statements. Consequently, Ocwen has failed to maintain reasonably designed policies and procedures to ensure that borrowers, including Plaintiffs, receive timely and accurate escrow statements.

88.     As a result, in mid-2014, Ocwen performed escrow analyses for an estimated 10,000 to 20,000 borrowers but then failed to generate or timely send the required escrow statements to these borrowers within the required year.

///

///

_____
Adversary Complaint

89.     When Ocwen has sent escrow statements, in many instances, the escrow statements have contained inaccurate information pertaining to the Plaintiffs account history, escrow balance, and escrow payments. In September of 2014, Ocwen's then Head of Servicing Compliance acknowledged this failure in internal e-mails:

> Escrow notices not compliant with RESPA, not sent timely or not sent at all are huge and are the foundation for all else. These are, by the way, the three biggest borrower communication issues across the board for Ocwen - required content not included, letter not sent, or letter not sent timely. This is estimated to impact 800,000 borrowers or 52% of the Ocwen customer base. (Emphases added.)

90.     Third, Ocwen has failed to timely process escrow shortage payments—i.e., payments that borrowers made at Ocwen's request to satisfy a shortage or deficiency in their escrow accounts—that Ocwen needed to pay the borrowers' insurance or tax disbursements, in violation of Regulation X.

91.     Since 2014, Ocwen's personnel has manually entered a comment code in REALServicing when the borrower has paid an escrow shortage. As Ocwen's auditors found in a March 30, 2016 audit, however, Ocwen did not have adequate controls over the entry of these comment codes and therefore Ocwen did not catch when its personnel failed to manually enter appropriate comment codes relating to escrow shortages. As Ocwen's auditors found, this resulted in "the continued collection of escrow shortage amounts" that borrowers already paid. Specifically, Ocwen failed to timely process escrow shortage payments for what Ocwen estimates to be 5,000 to 10,000 borrowers.

92.     Fourth, in many instances, Ocwen has miscalculated Plaintiffs escrow amounts or mistakenly imposed escrow requirements, resulting in Ocwen charging, collecting, or attempting to collect, through communications to Plaintiffs, incorrect escrow amounts.

///

///

///

93.    Ocwen has miscalculated Plaintiffs escrow amounts by mistakenly paying Plaintiffs insurance premium charges twice; disbursing Plaintiffs insurance premiums to the wrong insurance company and failing to account for escrow amounts or accurate escrow amounts in Plaintiffs loan modification payment amounts (e.g., borrowers' modified monthly mortgage payments), which borrowers learn of only after accepting the new modified amount.

94.    In the bankruptcy context, Ocwen has also failed to generate accurate escrow amounts. In late 2014, the Head of Ocwen's Escrow Department wrote in an email, which was forwarded to Ocwen's Chief Executive Officer:

> I've stressed importance of getting the BK escrow balance issues fixed, but no confirmation of root cause or target correction date . . . . It's a system issue because a bucket that determines the amount of money that a customer sends for their monthly payment can change with no record of why on the system . . . . Please help get the importance across on this issue. If this is not fixed, I cannot recommend that we move to analyze BK for the portfolio. Even with a control report to catch them, there is still risk the balance will be wrong when you actually analyze the account. (Emphases added.)

95.    In late 2014, Ocwen's then Head of Servicing also emailed Ocwen's Chief Executive Officer and asked for additional consulting resources to handle Ocwen's escrow deficiencies because, as Ocwen's Head of Servicing Operations reported: "you are familiar with this issue - the BK escrow balance bucket is wrong and requires every BK loan to be manually reviewed and we can still have errors."

96.    Fifth, as a result of Ocwen's above failures, Ocwen has communicated, orally and in writing, inaccurate information to Plaintiffs about escrow amounts, reinstatement amounts, and payoff amounts. These representations are material to Plaintiffs managing their mortgage and are likely to mislead Plaintiffs acting reasonably under the circumstances.

*3.    Ocwen's escrow failures have caused significant borrower harm.*

97.    Ocwen's escrow errors have caused significant harm to Plaintiffs, including the costs and emotional distress that Plaintiffs suffer when attempting to get Ocwen to correct its mistakes.

_____
Adversary Complaint

98.     This type of harm disproportionately affected Plaintiff Sanders bankruptcy. As Ocwen's former Head of Servicing Compliance testified:

> If you have a borrower who is sixty days down or in BK [bankruptcy], if an analysis is done and they find that the escrow account is short and the payment has to go up by fifty bucks…..If you've got somebody that's sixty days down or in BK [bankruptcy] and all of a sudden, because of a shortage in the escrow account, their payment goes up by fifty bucks, that can make a big difference. So it can have a disproportionate impact because they're already on the ropes financially

99.     From April 2015 to April 2016, Ocwen received more than 53,000 complaints relating to its handling of escrow accounts. Ocwen determined it made numerous errors in the following categories: "Escrow Analysis Needed, Last Analysis Incorrect"; "Escrow Payment Change Inquiry"; "Escrow Info Incorrect or Not Set Up"; "Escrow Analysis Needed"; "Escrow Overage Not Received"; "Escrow Payment Change Dispute"; "Escrow Analysis Needed due to Payment"; "Negative Escrow Balance"; "Escrow Analysis Requested due to Refund"; and "Taxes Escrowed- Paid on Wrong Parcel."

**C.     Ocwen has failed to protect Plaintiffs when it has made servicing errors.**

100.    Ocwen's errors at every loan servicing stage have made it even more important that the company adequately investigate and respond to Plaintiffs complaints and notices of errors. These functions can act as a "safety net" to catch Plaintiffs before they are further harmed by Ocwen's unlawful conduct. Here, too, Ocwen has failed Plaintiffs. Since April 2015, Ocwen has received more than 580,000 complaints and written notices of error from more than 300,000 different borrowers, including Plaintiffs.

101.    Since 2014, Ocwen has routinely failed to reasonably investigate, and, when appropriate, make corrections in response to Plaintiffs complaints and notices of errors. These failures have caused serious harm to Plaintiffs.

///

///

///

_____
Adversary Complaint

*1.      Ocwen's obligations under Regulation X.*

102.    Under Regulation X, servicers are required to have policies and procedures that are reasonably designed to ensure that Ocwen investigates, responds to, and, as appropriate, makes corrections in response to complaints by borrowers. Written borrower notices that are sent to an Ocwen-designated address and allege certain types of errors are considered a qualified written request and notice of error (collectively "NOE") and entitle borrowers to additional protections under RESPA and Regulation X. For both complaints and written NOEs, servicers generally are required to conduct a reasonable investigation of the alleged error and, as appropriate, make corrections.

*2.      Ocwen has failed to comply with its obligations under Regulation X.*

103.    First, Ocwen has failed to implement policies and procedures that are reasonably designed to meet the consumer complaint handling objectives to respond, investigate, and, where appropriate, correct errors.

104.    Per Ocwen's policy, Ocwen call center personnel are supposed to escalate repeat complaints regarding the same issue to a supervisor or a designated call center employee, known as the borrower's "Escalation Relationship Manager." But, due to insufficient policies and procedures and an overreliance on rigid scripting, Ocwen call center personnel have failed to adequately resolve the complaint or escalate the call for investigation and correction of the error. As a result, Plaintiffs have been forced to call Ocwen multiple times about the same complaint before the call center personnel escalate the matter for investigation and error correction.

105.    In April 2015, Ocwen implemented new policies and procedures to address the difficulty its call center personnel had in recognizing and escalating borrower complaints. These policies and procedures, however, were not reasonably designed to handle consumer complaints. For example, instead of requiring Ocwen to identify a complaint the first time a borrower calls in, the new policies and procedures place the burden on the borrower to complain multiple times–at least five times in nine days– before Ocwen will automatically escalate their complaint for resolution to an Escalation Relationship Manager.

106.    As a result, Plaintiffs have been forced to call Ocwen multiple times before Ocwen investigated the error. For example, of the more than 450,000 complaints that Ocwen processed from April 2015 through April 2016, approximately 68 percent involved borrowers who contacted Ocwen multiple times within a 15-day period; approximately 40 percent involved borrowers who contacted Ocwen three or more times within a 15-day period; and approximately 17 percent involved borrowers who contacted Ocwen five or more times within a 15-day period.

107.    Ocwen's policies and procedures have not been reasonably designed to ensure that its personnel conduct reasonable investigations of the alleged error in complaints. Ocwen's policies and procedures, for instance, direct Ocwen personnel to rely on the information in REALServicing to investigate complaints. Thus, Ocwen's ability to appropriately investigate complaints is largely dependent on the accuracy of the information contained within REALServicing. Further, Ocwen's policies and procedures provide little to no guidance to personnel on how to document the step-by step basis for their conclusions regarding the validity of an alleged error.

108.    Ocwen's policies and procedures also provide little or no guidance to personnel about how to correct errors. For example, Ocwen's policies and procedures do not detail what factors personnel should consider when recommending remediation, including what types of harms and downstream impacts to borrowers they should consider. At best, Ocwen's policies and procedures identify certain forms of remediation such as fee waivers and credit reporting corrections, but do not inform personnel when these or other forms of remediation are appropriate. Without such guidance, Ocwen personnel are left to their own discretion to determine whether an error has occurred, and, if so, how to correct the error.

///

///

///

_____
Adversary Complaint

109.    Second, as a result of Ocwen's above policies and procedures, which also apply to NOEs, Ocwen has failed to conduct reasonable investigations and/or, where appropriate, make corrections of errors in Plaintiffs complaints and NOEs. Among other things, Ocwen has relied on inaccurate data in REALServicing, and the Ocwen personnel who investigate borrowers' complaints and NOEs are not required to cross reference Ocwen's known and documented systemic errors, such as the payment processing and application, escrow, and insurance errors, and thus do not consider that information in their investigations. Further, in responding to certain complaints and NOEs, Ocwen has simply parroted back the information in REALServicing, including details set forth in payment and escrow histories, without addressing the errors presented by Plaintiffs.

3.    *Ocwen's consumer complaint and NOE handling failures have caused significant borrower harm.*

110.    Ocwen's failure to properly investigate Plaintiffs complaints and NOEs and correct errors has caused significant harm to Plaintiffs.

111.    Ocwen's consumer complaint and NOE failures are illustrated by the experience of Plaintiffs, including those described in Section V of this Adversary Complaint.

## D.    OCWEN HAS FAILED TO SUFFICIENTLY REMEDIATE HARM TO PLAINTIFFS

112.    Ocwen is aware that its servicing failures have caused significant harm to Plaintiffs and that these failures have had devastating consequences.

113.    Despite its awareness of the harm it has caused, Ocwen has had no consistent policy, procedure, or practice for providing Plaintiffs remediation, even when it has identified a systemic failure that could harm numerous borrowers, including Plaintiffs.

114.    Ocwen has lacked a systematic process to track and analyze errors it learns of through borrower complaints or NOEs to determine whether other borrowers may have been harmed by the same errors. As a result, Ocwen has typically only corrected errors or provided remediation to those borrowers who have complained (assuming Ocwen recognizes the call as an actual complaint, investigates, and/or makes a correction) or submitted an NOE, but

generally has not corrected the same or similar errors for other borrowers who did not complain.

115.    Ocwen also has not had policies or procedures requiring it to determine whether a risk item on its Risk Convergence Report has impacted or harmed borrowers, or whether borrower remediation is required, before it "closes" that risk item.

116.    Instead, Ocwen has focused on operational remediation to correct the error and prevent any future impact on borrowers. As a result, in many instances, Ocwen has failed to identify the borrower population that was impacted by a given risk item or to provide full remediation to that population. Instead, Ocwen generally provides borrower remediation only when a borrower complains to Ocwen or when a court or regulator requires Ocwen to provide a borrower with relief.

117.    As Ocwen's former Head of Servicing Compliance testified in May of 2016:

> The company didn't have a policy or a protocol [for borrower remediation]. And with all of the issues, you saw how many issues there were [on the Risk Convergence Report], there just wasn't an appetite to back up and create an approach to this. Would I have liked that to have happened, I would have loved it, but it did not happen and there wasn't an appetite for it.

118.    Ocwen's "appetite" for borrower remediation appears to have been further diminished when the remediation could have a significant financial impact on Ocwen. For example, in one email, Ocwen personnel discussed Ocwen's auditors' findings that Ocwen lacked "processes to review and ensure compliance with state laws for negative amortization" relating to adjustable rate mortgages, and whether to review impacted loans and provide borrowers with remediation. After analyzing the potential $21 million in costs for Ocwen to remediate, Ocwen declined to do so due to the "substantial, negative financial impact and Legal confirmation that [Privileged material redacted] is sufficient justification to forego the lookback."

///

///

///

_____
Adversary Complaint

119.    Ultimately, Ocwen's former Head of Compliance conceded in testimony that Ocwen should remediate borrowers who were harmed by Ocwen's errors and suffered potential harm. When asked if Ocwen did so, she conceded: "Could the company have done more? Absolutely."

## IV.    OCWEN'S HISTORY WITH REGULATORS

120.    Since 2014, Ocwen has entered into several settlements with various regulators and state attorneys general to attempt to resolve ongoing servicing misconduct and regulatory deficiencies in Ocwen's servicing operations.

121.    In February of 2014, Ocwen Financial and Ocwen Loan Servicing entered a Consent Judgment with the California Attorney General and 48 other states, the District of Columbia and the CFPB1 to address and resolve servicing misconduct including misapplying borrower payments; failing to maintain accurate account statements; charging unauthorized fees for default related services; improperly imposing force-placed insurance; failing to provide accurate and timely information to borrowers relating to loss mitigation services and eligibility for loan modifications; among other misconduct.

122.    In December of 2014, the New York Department of Financial Services ("NY DFS") restricted Ocwen's ability to acquire mortgage servicing rights ("MSR(s)") on additional New York loans and the California Division of Business Oversight ("CA DBO") placed a similar MSR ban in January of 2015. These bans were put in place due to misconduct identified by those regulators and a perception that Ocwen could not be trusted to accurately service mortgage loans. The ban imposed by CA DBO was lifted on February 17, 2017. The NY DFS ban is still in place.

123.    The Florida Office of Financial Regulation engaged in a limited examination in 2015, along with the states of Maryland, Massachusetts, Mississippi, Montana, and Washington, in response to concerns raised by consumer complaints about, among other things, Ocwen's handling of consumer escrow accounts and failure to make insurance payments from escrow accounts. The examination reviewed a sampling of borrower loans from January 1, 2013 through February 28, 2015.

124.     During this multi-state examination of Ocwen, the Florida Office of Regulation identified compliance violations of both federal and state law under Section 494.00255(1)(m), Florida Statutes.

125.     Additionally, several state regulators fined Ocwen for its use of unlicensed business entities in the Philippines and India to service its mortgage portfolio. Ocwen maintains an affiliate named Ocwen Business Solutions, Inc. ("OBS") in the Philippines. OBS engaged in unlicensed mortgage servicing activity during the time-period of August 26, 2013 to September 13, 2015. In 2016, Ocwen entered a Consent Order with the Florida Office of Financial Regulation to settle concerns regarding Ocwen's unlicensed business activity from the Philippines. Upon information and belief, Ocwen continues to presently conduct unlicensed business from India.

126.     In January 2017, the United States Inspector General for the Troubled Asset Relief Program released a report stating that Ocwen has one of the worst track records in foreclosure mitigation. The report includes a finding that in a sampling of loans tested, Ocwen had wrongfully terminated borrowers from HAMP loan modifications in 2016. The report cited Ocwen for improperly holding borrower payments in expense accounts, improperly reversing and reapplying payments, and mishandling rolling delinquencies.

///

///

///

127.    Most recently, on April 20, 2017, the U.S. Consumer Financial Protection Bureau ("CFPB") issued a press release entitled "Consumer Financial Protection Bureau sues Ocwen for failing borrowers throughout mortgage servicing process," reporting that the Company had generated errors in borrowers' accounts, failed to credit payments, illegally foreclosed on homeowners, and charged borrowers for add-on products without their consent. The press release, in part:

> WASHINGTON, D.C. — The Consumer Financial Protection Bureau (CFPB) today sued one of the country's largest nonbank mortgage loan servicers, Ocwen Financial Corporation, and its subsidiaries for failing borrowers at every stage of the mortgage servicing process. The Bureau alleges that Ocwen's years of widespread errors, shortcuts, and runarounds cost some borrowers money and others their homes. Ocwen allegedly botched basic functions like sending accurate monthly statements, properly crediting payments, and handling taxes and insurance. Allegedly, Ocwen also illegally foreclosed on struggling borrowers, ignored customer complaints, and sold off the servicing rights to loans without fully disclosing the mistakes it made in borrowers' records. The Florida Attorney General took a similar action against Ocwen today in a separate lawsuit. Many state financial regulators are also independently issuing cease-and-desist and license revocation orders against Ocwen for escrow management and licensing issues today. "Ocwen has repeatedly made mistakes and taken shortcuts at every stage of the mortgage servicing process, costing some consumers money and others their homes," said CFPB Director Richard Cordray. "Borrowers have no say over who services their mortgage, so the Bureau will remain vigilant to ensure they get fair treatment." Ocwen, headquartered in West Palm Beach, Fla., is one of the nation's largest nonbank mortgage servicers. As of Dec. 31, 2016, Ocwen serviced almost 1.4 million loans with an aggregate unpaid principal balance of $209 billion. It services loans for borrowers in all 50 states and the District of Columbia. A mortgage servicer collects payments from the mortgage borrower and forwards those payments to the owner of the loan. It handles customer service, collections, loan modifications, and foreclosures. Ocwen specializes in servicing subprime or delinquent loans. The CFPB uncovered substantial evidence that Ocwen has engaged in significant and systemic misconduct at nearly every stage of the mortgage servicing process. The CFPB

///

_____
Adversary Complaint

is charged with enforcing the Dodd-Frank Wall Street Reform and Consumer Protection Act, which protects consumers from unfair, deceptive, or abusive acts or practices, and other federal consumer financial laws. In addition, the Bureau adopted common-sense rules for the mortgage servicing market that first took effect in January 2014. The CFPB's mortgage servicing rules require that servicers promptly credit payments and correct errors on request. The rules also include strong protections for struggling homeowners, including those facing foreclosure. In its lawsuit, the CFPB alleges that Ocwen:

- Serviced loans using error-riddled information: Ocwen uses a proprietary system called REALServicing to process and apply borrower payments, communicate payment information to borrowers, and maintain loan balance information. Ocwen allegedly loaded inaccurate and incomplete information into its REALServicing system. And even when data was accurate, REALServicing generated errors because of system failures and deficient programming. To manage this risk, Ocwen tried manual workarounds, but they often failed to correct inaccuracies and produced still more errors. Ocwen then used this faulty information to service borrowers' loans. In 2014, Ocwen's head of servicing described its system as "ridiculous" and a "train wreck."

- Illegally foreclosed on homeowners: Ocwen has long touted its ability to service and modify loans for troubled borrowers. But allegedly, Ocwen has failed to deliver required foreclosure protections. As a result, the Bureau alleges that Ocwen has wrongfully initiated foreclosure proceedings on at least 1,000 people, and has wrongfully held foreclosure sales. Among other illegal practices, Ocwen has initiated the foreclosure process before completing a review of borrowers' loss mitigation applications. In other instances, Ocwen has asked borrowers to submit additional information within 30 days, but foreclosed on the borrowers before the deadline. Ocwen has also foreclosed on borrowers who were fulfilling their obligations under a loss mitigation agreement.

///
///
///

_____
Adversary Complaint

- Failed to credit borrowers' payments: Ocwen has allegedly failed to appropriately credit payments made by numerous borrowers. Ocwen has also failed to send borrowers accurate periodic statements detailing the amount due, how payments were applied, total payments received, and other information. Ocwen has also failed to correct billing and payment errors.

- Botched escrow accounts: Ocwen manages escrow accounts for over 75 percent of the loans it services. Ocwen has allegedly botched basic tasks in managing these borrower accounts. Because of system breakdowns and an over-reliance on manually entering information, Ocwen has allegedly failed to conduct escrow analyses and sent some borrowers' escrow statements late or not at all. Ocwen also allegedly failed to properly account for and apply payments by borrowers to address escrow shortages, such as changes in the account when property taxes go up. One result of this failure has been that some borrowers have paid inaccurate amounts.

- Mishandled hazard insurance: If a servicer administers an escrow account for a borrower, a servicer must make timely insurance and/or tax payments on behalf of the borrower. Ocwen, however, has allegedly failed to make timely insurance payments to pay for borrowers' home insurance premiums. Ocwen's failures led to the lapse of homeowners' insurance Case 9:17-cv-80500-RLR Document 1 Entered on FLSD Docket 04/21/2017 Page 4 of 28 5 coverage for more than 10,000 borrowers. Some borrowers were pushed into force-placed insurance.

- Bungled borrowers' private mortgage insurance: Ocwen allegedly failed to cancel borrowers' private mortgage insurance, or PMI, in a timely way, causing consumers to overpay. Generally, borrowers must purchase PMI when they obtain a mortgage with a down payment of less than 20 percent, or when they refinance their mortgage with less than 20 percent equity in their property. Servicers must end a borrower's requirement to pay PMI when the principal balance of the mortgage reaches 78 percent of the property's original value. Since 2014, Ocwen has failed to end borrowers' PMI on time after learning

///

_____
Adversary Complaint

information in its REALServicing system was unreliable or missing altogether. Ocwen ultimately overcharged borrowers about $1.2 million for PMI premiums, and refunded this money only after the fact.

- Deceptively signed up and charged borrowers for add-on products: When servicing borrowers' mortgage loans, Ocwen allegedly enrolled some consumers in add-on products through deceptive solicitations and without their consent. Ocwen then billed and collected payments from these consumers.

- Failed to assist heirs seeking foreclosure alternatives: Ocwen allegedly mishandled accounts for successors-in-interest, or heirs, to a deceased borrower. These consumers included widows, children, and other relatives. As a result, Ocwen failed to properly recognize individuals as heirs, and thereby denied assistance to help avoid foreclosure. In some instances, Ocwen foreclosed on individuals who may have been eligible to save these homes through a loan modification or other loss mitigation option.

- Failed to adequately investigate and respond to borrower complaints: If an error is made in the servicing of a mortgage loan, a servicer must generally either correct the error identified by the borrower, called a notice of error, or investigate the alleged error. Since 2014, Ocwen has allegedly routinely failed to properly acknowledge and investigate complaints, or make necessary corrections. Ocwen changed its policy in April 2015 to address the difficulty its call center had in recognizing and escalating complaints, but these changes fell short. Under its new policy, borrowers still have to complain at least five times in nine days before Ocwen automatically escalates their complaint to be resolved. Since April 2015, Ocwen has received more than 580,000 notices of error and complaints from more than 300,000 different borrowers.

- Failed to provide complete and accurate loan information to new servicers: Ocwen has allegedly failed to include complete and accurate borrower information when it sold its rights to service thousands of loans to new mortgage servicers. This has hampered the new servicers' efforts to comply with laws and investor guidelines.

34

- The Bureau also alleges that Ocwen has failed to remediate borrowers for the harm it has caused, including the problems it has created for struggling borrowers who were in default on their loans or who had filed for bankruptcy. For these groups of borrowers, Ocwen's servicing errors have been particularly costly.

128.    Despite multiple lawsuits and regulatory actions by various state attorneys general, state regulators, and federal agencies, Ocwen continues to violate federal and state laws and industry standards. As a result, Plaintiffs, along with borrowers throughout the United States, have, and will continue to suffer financial injury, and in some instances, loose or be placed in imminent risk of losing their homes.

## V.    OCWEN'S MISHANDLING OF PLAINTIFFS LOAN FROM AT LEAST 2014

### A.    Missing Bankruptcy Trustee Payments

129.    The Bankruptcy Trustee Periodic Report, shows as of March 31, 2017, the Trustee made payments to Ocwen totaling $4,071.96.  However, even though Ocwen records show it received the payments, Ocwen reversed several without explanation.  After taking all of the Trustee payments and deducting the reversals, the total amount Ocwen credited to the Loan is $3,188.96.  Therefore, there is a total of $883.00 unaccounted for by Ocwen.

130.    On March 17, 2017, Plaintiffs sent a Qualified Written Request ("QWR") to Ocwen requesting it provide documentation on how the Trustee's payments were posted to their account and where the reversed payments were allocated.  Ocwen responded with a broiler plate response stating it applied all payments received on the loan in accordance with all applicable federal and state laws.  Nothing in the letter addresses where the missing Trustee payments are or how each were allocated to Plaintiffs loan.

### B.    Missing Payments Made Under Ocwen's ACH Program

131.    On July 26, 2016, Ocwen approved Plaintiffs for the ACH Bi-Weekly deduction program. The first bi-weekly payment for $1,885.68 was scheduled by Ocwen to be automatically deducted from their bank account on August 11, 2016.

///

132.    On August 12, 2016, Plaintiffs received an email confirmation from Ocwen stating it had received their payment of $1,885.68 on August 11, 2016.

133.    On August 29, 2016, Plaintiffs received an email confirmation from Ocwen stating it had received their payment of $942.84 on August 25, 2016.

134.    On August 30, 2016, Plaintiffs emailed Ocwen stating they were concerned that the amounts being withdrawn under the ACH program were incorrect.

135.    Despite Plaintiffs concerns, on September 12, 2016, Plaintiffs received an email confirmation from Ocwen stating it had received their payment of $471.42 on September 8, 2016.

136.    After receiving no response to their email of August 30, 2016, Plaintiffs set up a meeting to discuss the situation with a relationship manager.  On September 22, 2016, Plaintiffs spoke with a relationship manager and were advised that the system was correct and not to worry and that their loan was considered contractually current.

137.    On September 23, 2016, Plaintiffs received an email confirmation from Ocwen stating it had received their payment of $235.71 on September 22, 2016. Because Ocwen continued to withdrawal the payments under the ACH program, Plaintiffs believed Ocwen was deducting the correct amount as represented to Plaintiffs in the phone conversation of September 22, 2016.

138.    On October 21, 2016, Plaintiffs received an email from Ocwen stating that due to a "technical glitch" incorrect amounts were drafted from their bank account and that it had cancelled the bi-weekly ACH program, reversed funds totaling $2,079.43 and placed them in a suspense account. However, as shown above, Plaintiffs bank account was debited a total of $3,535.65 under the ACH program, thereby leaving a total of $1,456.22 unaccounted for by Ocwen.

///

///

///

139.    On March 17, 2017, Plaintiffs sent a QWR to Ocwen requesting Ocwen provide documentation on where the missing payments were and where the reversed payments were allocated.   Ocwen responded with a broiler plate response stating it applied all payments received on the loan in accordance with all applicable federal and state laws.   Nothing in the letter addresses where the missing payments are.

### C.    Unexplained Principal Balance Increase

140.    On November 7, 2016, Ocwen increased Plaintiffs principal balance by $47,361.55 without any explanation.

141.    On March 17, 2017, Plaintiffs sent a QWR to Ocwen requesting Ocwen provide documentation on why there was a principal increase and what the $47,361.55 consisted of. Ocwen responded with a broiler plate response stating "The principal balance is currently in the amount of $776,669.40". Nothing in the response addresses how it calculated the principal increase and why a principal increase was added to Plaintiffs loan.

### D.    Reversed and Unapplied Payments

142.    On September 11, 2014, Plaintiffs made a payment via bank wire transfer to Ocwen in the amount of $3,581.08.   This payment was reversed by Ocwen on September 14, 2014 without explanation.

143.    On September 16, 2014, Plaintiffs made a payment via automatic debit to Ocwen in the amount of $3,037.93, which was paid by Plaintiffs bank on September 17, 2014. This payment was reversed by Ocwen on September 18, 2014 without explanation.

144.    On October 26, 2014, Plaintiffs made a payment via automatic debit to Ocwen in the amount of $3,408.52, which was paid by Plaintiffs bank on October 27, 2014.   This payment was never credited to Plaintiffs loan.

145.    On November 3, 2014, Plaintiffs made a payment via automatic debit to Ocwen in the amount of $1,443.31, which was paid by Plaintiffs bank on November 4, 2014.   This payment was reversed by Ocwen on January 27, 2015 without explanation.

///

///

_____
Adversary Complaint

146.    On December 18, 2014, Plaintiffs made a payment via automatic debit to Ocwen in the amount of $2,395.80, which was paid by Plaintiffs bank on December 19, 2014.  This payment was reversed by Ocwen on January 27, 2015 without explanation and not reapplied to the loan.

147.    On February 10, 2015, Plaintiffs made a payment to Ocwen in the amount of $10,225.56, which cleared their bank on February 12, 2015.  This amount was later reversed by Ocwen on February 11, 2015 without explanation.

148.    On March 17, 2017, Plaintiffs sent a QWR to Ocwen requesting Ocwen provide documentation on why the payments were reversed and where the payments were allocated. Ocwen failed to provide any response to this request.

### E.    Unexplained or Unauthorized Charges

149.    Ocwen has continually charged Plaintiffs for property inspections, property valuations, certified mail costs and returned check fees since 2014.  By way of example, Ocwen charged and collected from Plaintiffs the following fees, but certainly not a complete list:

- 12 property inspections on September 16, 2014 (12 property inspections in one day?).
- 5 property valuations on September 16, 2014.  (5 property valuation in one day?).
- 8 property inspections on October 24, 2014 (8 property inspections in one day?).
- 4 property valuations on October 24, 2014.  (4 property valuations in one day?).
- 4 property inspections on January 27, 2015 (3 property inspections in one day?).
- 2 property valuations on January 27, 2014 2014.  (2 property valuation in one day?).
- 5 property inspections on November 7, 2016.
- 22 returned check fees on April 30, 2014.
- 30 returned check fees on September 5, 2014.
- 34 returned check fees on September 16, 2014.
- 5 returned check fees on November 26, 2014.
- 7 returned check fees on December 17, 2014.
- 39 returned check fees on November 7, 2016.
- 9 certified mail costs on January 27, 2015.
- 13 certified mail costs on November 7, 2016.

_____

### FIRST CAUSE OF ACTION

*(Violations of the California Deceptive and Unfair Trade Practices Act Against All*

*Defendants)*

150.    Plaintiffs incorporate Paragraphs 1 through 55 above as though fully set forth in full.

151.    Business & Professions Code §17200 prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business & Professions Code" and reaches past and one-time acts.

152.    Beginning in 2014, Ocwen has committed acts of unfair competition, as defined by Business & Professions Code §17200, by engaging in, but not limited to, the following practices:

        a.    Misrepresenting to Plaintiffs their outstanding loan balance;

        b.    Misrepresenting to Plaintiffs their monthly payments due;

        c.    Misrepresenting to Plaintiffs their escrow amounts due;

        d.    Misrepresenting the delinquency status of Plaintiffs loan;

        e.    Misrepresenting the default fees due;

        f.    Misrepresenting loan reinstatement amounts;

        g.    Misrepresenting property inspections amounts due;

        h.    Misrepresenting property valuations amounts due;

        i.    Misrepresenting certified mail costs amounts due; and

        j.    Misrepresenting returned check fees costs due.

153.    When the Ocwen engaged in the conduct and made the representations described herein, they knew or should have known (a) the data and records upon which they were relying was inaccurate or missing and that they have failed to review information that is necessary to have a reasonable basis to collect on; and (b) their system of record contains inaccurate information about Plaintiffs payments and amounts due, including reinstatement amounts, suspense balances, default fees dues, property inspections fees, property valuation fees, certified mail costs, returned check fees, and delinquency status, all of which it relies upon

39

in demand letters, billing statements, motions for relief from the automatic stay and other communications with Plaintiffs, and that they have failed to review information that is necessary to have a reasonable basis to collect on Plaintiffs loan.

154.    Ocwen has willfully engaged in these unfair and deceptive acts and practices because Ocwen knew or should have known that such acts and practices are unfair or deceptive or otherwise prohibited by law.

155.    These above-described acts and practices of Ocwen have substantially injured and will likely continue to injure and prejudice Plaintiffs. The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to not only Plaintiffs, but consumers at large. Further, these substantial injuries are not outweighed by any countervailing benefits to consumers or competition, and are not injuries that the Plaintiffs themselves could have reasonably avoided.

156.    Plaintiffs were personally victimized by Ocwen's practice and lost money as a result of the unlawful practices described above.  Plaintiffs have standing to bring this action because, because as set forth hereinabove, Plaintiffs have suffered injury in fact as a result of Ocwen's conduct and lost money as a result of Ocwen's practice, including but not limited to, payment of increased interest, longer loan payoff time, higher principle balance, and payment of other charges collected by Ocwen.

157.    Pursuant to Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action.

## SECOND CAUSE OF ACTION

*(Violations of the California's Deceptive and Unfair Trade Practices Act for Ocwen's Failure to Timely and Appropriately Credit Payments)*

158.    Plaintiffs incorporate Paragraphs 1 through 63 above as though fully set forth in full.

159.    In the course of servicing Plaintiffs loan, Ocwen has regularly sent Plaintiffs inaccurate periodic statements.

///

_____

160.    In the course of servicing Plaintiffs loan, Ocwen have failed to accurately detail on periodic statements the current amounts due by Plaintiffs.

161.    In the course of servicing Plaintiffs loan, Ocwen has failed to explain how Plaintiffs future payments will be applied.

162.    In the course of servicing Plaintiffs loan, Ocwen has failed to account to Plaintiffs all account activity since the prior periodic statement.

163.    In the course of servicing Plaintiffs loan, Ocwen has retained any partial payments by Plaintiffs in a suspense or unapplied funds account, failed to disclose to the Plaintiffs the total amount of funds held in such suspense or unapplied funds account.

164.    In the course of servicing Plaintiffs loan, Ocwen has after an accumulation of funds sufficient to make a periodic payment is received in Plaintiffs suspense account, failed to treat such funds as a periodic payment as of the date of receipt.

165.    In the course of servicing Plaintiffs loan, Ocwen has failed to timely and appropriately credit Plaintiffs full periodic payments as of the date of receipt.

166.    In the course of servicing Plaintiffs loan, Ocwen reversed payments with no cause or explanation and has refused to provide an accounting of where those reversed funds were applied.

167.    Ocwen has willfully engaged in these unfair and deceptive acts and practices because Ocwen knew or should have known that such acts and practices are unfair or deceptive or otherwise prohibited by law.

168.    Ocwen's errors have resulted in significant harm to Plaintiffs, including but not limited to improper late fees, inaccurate negative credit reporting, and Plaintiffs frustration. These harms are compounded because Plaintiffs are inaccurately considered as delinquent and being threatened with collections and foreclosure.

169.    These above-described acts and practices of Ocwen have substantially injured and will likely continue to injure and prejudice Plaintiffs. The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to both Plaintiffs and consumers at large. Further, these substantial injuries are not outweighed by any

countervailing benefits to consumers or competition, and are not injuries that the Plaintiffs themselves could have reasonably avoided.

170.    Plaintiffs were personally victimized by Ocwen's practice and lost money as a result of the unlawful practices described above.  Plaintiffs have standing to bring this action because, because as set forth hereinabove, Plaintiffs have suffered injury in fact as a result of Ocwen's conduct and lost money as a result of Ocwen's practice, including but not limited to, payment of increased interest, longer loan payoff time, higher principle balance, and payment of other charges collected by Ocwen.

171.    Pursuant to Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action.

### THIRD CAUSE OF ACTION

*(Violations of RESPA Regarding Escrow Violations)*

172.    Plaintiffs incorporate Paragraphs 1 through 77 above as though fully set forth in full.

173.    Under RESPA and Regulation X, servicers are required to (1) perform an annual escrow analysis to determine the monthly escrow account payments for the next computation year; (2) provide an annual statement reflecting the activity in the escrow account during the escrow account computation year and a projection of the activity in the account for the next year; (3) refund to the borrower any surplus disclosed in an escrow analysis or, if the surplus is less than $50, alternatively credit such surplus against future escrow payments; and (4) potentially seek repayment for any shortage (i.e., the amount by which a current escrow account balance falls short of the target balance at the time of an escrow analysis) disclosed in an escrow analysis.

174.    Ocwen has failed to perform the most basic tasks regarding the management of Plaintiffs escrow account. In violation of federal law, Ocwen has failed to conduct annual escrow analyses, failed to conduct accurate escrow analyses, and failed to provide Plaintiffs with annual statements that reflect escrow activity.

///

_____

175.     Additionally, deficiencies with REALServicing lie at the root of various problems with Ocwen's calculation of delinquent borrowers' payoff and reinstatement quotes; that is, the amount Plaintiffs must pay to respectively payoff or reinstate their loan to become current. These payoff and reinstatement quotes depend upon Plaintiffs escrow balance.

176.     In many instances, even when Ocwen performed an escrow analyses on Plaintiffs account, Ocwen has either: (1) failed to send escrow statements to Plaintiffs because of REALServicing system deficiencies; or (2) sent inaccurate escrow statements.

177.     When Ocwen has sent escrow statements, in many instances the escrow statements have contained inaccurate information pertaining to the Plaintiffs account history, escrow balance, and escrow payment.

178.     Ocwen failed to perform or timely perform escrow analyses during the pendency of a Plaintiffs Sanders' Chapter 13 bankruptcy and failed to service Plaintiffs loan in accordance with bankruptcy protections in place for borrowers.

179.     Due to Ocwen's failures related to Plaintiffs escrow account, including but not limited to disbursement of inaccurate escrow amounts, reinstatement amounts and payoff amounts, Ocwen has communicated material information to Plaintiffs that Ocwen knew or should have known was inaccurate. The above practices employed by Ocwen caused Plaintiffs to receive inaccurate and misleading escrow-related communications

180.     RESPA and Regulation X apply to the conduct of "servicers," including the servicing of federally related mortgage loans, the administration of borrowers' escrow accounts, error resolution procedures, force-placed insurance, general servicing policies, procedures and requirements, and loss mitigation procedures. See 12 C.F.R. § 1024.2(b); see also 12 C.F.R. §§ 1024.34, 1024.35, 1024.37, 1024.38, and 1024.41.

181.     Regulation X defines a servicer as a person "responsible for servicing of a federally related mortgage loan." 12 C.F.R. § 1024.2(b). Under Regulation X, "servicing" means "receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan … and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts

received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract." 12 C.F.R. § 1024.2(b).

182.    Under RESPA and Regulation X, the Ocwen Defendants are "servicers" because they receive payments from borrowers pursuant to the terms of federally related mortgage loans and are responsible for, among other things, distributing the payments to investors who own the borrowers' loans and, when borrowers' loans include escrow accounts, to the borrowers' taxing authorities or insurance companies.

183.    In the course of servicing Plaintiffs loan, Ocwen has failed to conduct annual escrow analyses for Plaintiffs in violation of 12 C.F.R. § 1024.17(c)(3).

184.    In the course of servicing Plaintiffs Loan, in violation of 12 C.F.R. § 1024.17(i), Ocwen failed to provide Plaintiffs with annual escrow account statements within 30 days of the completion of the escrow computation year.

185.    These above-described acts and practices of Ocwen have substantially injured and will likely continue to injure and prejudice Plaintiffs. The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to both Plaintiffs and consumers at large. Further, these substantial injuries are not outweighed by any countervailing benefits to consumers or competition, and are not injuries that the Plaintiffs themselves could have reasonably avoided.

186.    Plaintiffs were personally victimized by Ocwen's practice and lost money as a result of the unlawful practices described above.  Plaintiffs have standing to bring this action because, because as set forth hereinabove, Plaintiffs have suffered injury in fact as a result of Ocwen's conduct and lost money as a result of Ocwen's practice, including but not limited to, payment of increased interest, longer loan payoff time, higher principle balance, and payment of other charges collected by Ocwen.

187.    Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action, any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000.

### FOURTH CAUSE OF ACTION

*(Violation of RESPA-Failure to Respond to Qualified Written Request as to All Defendants)*

188.    Plaintiffs incorporate Paragraphs 1 through 93 above as though fully set forth in full.

189.    Section 6(e)(1) of RESPA, 12 U.S.C. § 2605(e)(1), required servicers to provide a written response acknowledging receipt of a qualified written request from a consumer for information relating to the servicing of the loan within 20 days.

190.    Within 60 days of receipt of a qualified written request, Section 6(e)(2) of RESPA, 12 U.S.C. § 2605(e)(2), required servicers to make corrections to a consumer's account (and notify the consumer of the correction), conduct an investigation and tell the consumer the reason the account is not in error, or conduct an investigation and explain to the consumer why information requested is unavailable or cannot be obtained.

191.    A qualified written request is "written correspondence . . . that (i) includes, or otherwise enables the servicer to identify, the name and account of the consumer; and (ii) includes a statement of the reasons for the belief of the consumer, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the consumer." 12 U.S.C. § 2605(e)(1)(B).

192.    Plaintiffs sent correspondence to Ocwen with sufficient information for Ocwen to identify their names and account number regarding issues with their unpaid loan balance, payment due date, interest rate, monthly payment amount, and/or delinquency status. This correspondence constituted a "qualified written request."

193.    Ocwen violated RESPA by failing to make appropriate corrections to Plaintiffs account in response to the QWR, or to investigate or to explain why it would or could not do so.

194.    As a result of Ocwen's violations of RESPA Plaintiffs have suffered actual damages, including but not limited to devastation of their credit, monetary damages, and threatened foreclosure of their home.

195.    Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action, any additional damages, as the court may allow, in

45

the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000.

## FIFTH CAUSE OF ACTION

*(Violation of Automatic Stay)*

196.    Plaintiffs incorporate Paragraphs 1 through 102 above as though fully set forth in full.

197.    Pursuant to 11 U.S.C. § 362(a)(3) "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" violates the automatic stay. Defendants violated § 362(a)(3) by, among other things, (1) failing to properly credit payments to Plaintiffs account pursuant to the terms of the Note and Mortgage, (2) improperly holding payments in a suspense account, (3) creating false delinquencies and defaults, (4) collecting fees and other charges not yet approved by the Court including, but not limited to, property inspection fees, property valuation fees, and certified mail costs, (5) misapplying payments, and (6) submitting erroneous information in its Motion for Relief from Automatic Stay (i.e., delinquent amounts, payments, etc.).

198.    The above-described acts and practices of Ocwen have substantially injured and will likely continue to injure and prejudice Plaintiffs. The acts offend established public policy and are unethical, oppressive, unscrupulous or substantially injurious to both Plaintiffs and consumers at large. Further, these substantial injuries are not outweighed by any countervailing benefits to consumers or competition, and are not injuries that the Plaintiffs themselves could have reasonably avoided.  Therefore, Plaintiff is entitled to an award of punitive damages.

199.    Plaintiffs were personally victimized by Ocwen's practice and lost money as a result of the unlawful practices described above.  Plaintiffs have suffered injury in fact as a result of Ocwen's conduct and lost money as a result of Ocwen's practice, including but not limited to, payment of increased interest, longer loan payoff time, higher principle balance, and payment of other charges collected by Ocwen.

200.    Plaintiffs were personally victimized by Ocwen's practice and suffered emotional distress not associated with the anxiety and pressures inherent to the bankruptcy process.

_____

201.    Ocwen acted with malice and oppression and with a conscious disregard of Plaintiffs rights, making it liable for punitive damages under California Civil Code §3294.

202.    Plaintiffs are entitled to recover their reasonable attorney's fees, costs, and expenses incurred in bringing this action and any additional damages, as the court may allow.

## SIXTH CAUSE OF ACTION

### *(Accounting as to All Defendants)*

203.    Plaintiffs incorporate Paragraphs 1 through 108 above as though fully set forth in full.

204.    Despite Plaintiffs demands for an account reconciliation, including the QWR, Ocwen has failed and refused to provide same.  The amount of the arrears (if any), principal balance, etc. is unknown and cannot be assessed without an accounting of the loan.  Plaintiffs are entitled to a true and correct accounting from Ocwen.

205.    Plaintiffs have no plain, adequate or speedy remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

**First Cause of Action**

1.    For the declaratory, equitable, injunctive, equitable monetary and/or other relief as proven at trial;

2.    Attorney's fees and costs; and

3.    For such other and further relief as the Court deems just and proper.

**Second Cause of Action**

1.    For the declaratory, equitable, injunctive, equitable monetary and/or other relief as proven at trial;

2.    Attorney's fees and costs; and

3.    For such other and further relief as the Court deems just and proper.

///

///

///

## Third Cause of Action

1.    Actual damages to Plaintiffs as a result of the failure as proven at trial;

2.    Any additional damages, as the court may allow, for the pattern or practice of noncompliance with the requirements of this section by Ocwen, in an amount not to exceed $2,000.

3.    Attorney's fees and costs; and

4.    For such other and further relief as the Court deems just and proper.

## Fourth Cause of Action

1.    Actual damages to Plaintiffs as a result of the failure as proven at trial;

2.    Any additional damages, as the court may allow, for the pattern or practice of noncompliance with the requirements of this section by Ocwen, in an amount not to exceed $2,000.

3.    Attorney's fees and costs; and

4.    For such other and further relief as the Court deems just and proper.

## Fifth Cause of Action

1.    For general and special damages in an amount according to proof at trial;

2.    For punitive damages;

3.    Attorney's fees and costs; and

4.    For such other and further relief as the Court deems just and proper.

///

///

///

Adversary Complaint

**Sixth Cause of Action**

    1.      For an accounting of the Plaintiffs loan; and

    2.      Attorney's fees and costs; and

    3.      For such other and further relief as the Court deems just and proper.

Dated: 5/20/17

**TIMOTHY PAUL MILLER**
A Professional Law Corporation

Timothy P. Miller
Attorney for Plaintiffs

49

Adversary Complaint